IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEPHEN D. ROSENBAUM,　　　　:
　　　Plaintiff　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　:　　　Civil No. AMD 01-1967
　　　　　　　　　　　　　　　　　:
IMPERIAL CAPITAL, LLC, and　　　:
ELOISE RICH,　　　　　　　　　　:
　　　Defendants　　　　　　　　　:

...oOo...

AMENDED MEMORANDUM

In this diversity action, all of the parties to an arbitration proceeding seek an order

vacating in part and confirming in part the arbitral award pursuant to the Federal Arbitration

Act ("FAA"). *See* 9 U.S.C. § 9.[1] The claims of plaintiff Stephen D. Rosenbaum, M.D.

("Rosenbaum"), arose out of certain transactions in respect to an investment account he

maintained with defendant Imperial Capital, LLC ("Imperial"), which account was managed

by defendant Eloise Rich ("Rich"). The arbitral award was substantially in favor of

defendants. I have given careful attention to the parties' cross-motions to vacate in part and

the accompanying memoranda and exhibits. A hearing is not needed. Local R. 105.6. For

the reasons explained below, I shall deny the cross-motions to vacate and confirm the award

---

[1] The United States Code, Title 9, § 9 states, in pertinent part:
If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.
9 U.S.C. § 9.

in its entirety.

I.

A.

Rosenbaum is a Maryland resident and a doctor of orthopaedic medicine with an office in Baltimore. This case centers on two discrete transactions effected on Rosenbaum's behalf by defendants: a purchase of Groupo Mexican de Desarrollo ("GMD") bonds in September 1997 and a sale of Bank of New England ("BNE") bonds in December 1997.

Before and during 1997, Rosenbaum maintained an investment account with a non-party to this case, Dabney/Resnick/Imperial ("DRI"), whose offices were in California. Rich, a California resident, was employed as a broker by DRI. DRI had failed, however, to renew Rich's broker-dealer registration with the State of Maryland.[2] *See* MD. CODE ANN., CORPS. & ASS'NS § 11-402(a) (1999). Rich was assigned Rosenbaum's account in 1997 after Rosenbaum's broker left the firm. In September 1997, Rich solicited Rosenbaum to purchase the GMD bonds. Rosenbaum agreed to the purchase (at approximately $95,000), and the transaction took place that month. Effective December 1, 1997, defendant Imperial purchased the assets of DRI, and Rosenbaum's account was transferred to Imperial. Rich became employed by Imperial.

Rosenbaum had previously purchased BNE bonds (having a face value of $3 million)

---

[2] The Annotated Code of Maryland, Corporations and Associations, § 11-402(a) states that "[a] broker-dealer or issuer may not employ or associate with an agent unless the agent is registered." Rosenbaum contends that Imperial was not registered either. *Pl.'s Pet.* ¶ 7. Defendants contend, however, that Imperial was registered and admits that its employee, Rich, was not. *Defs.' Answer* ¶ 7.

in 1995, which he had transferred to his DRI account in November 1996. He paid $71,250 for the bonds. At the time of Imperial's purchase of the assets of DRI, the Bank of New England was in bankruptcy and the bonds were carried as "unpriced" on Rosenbaum's Imperial statements.

Rosenbaum's claims first arose in respect to a December 1997 transaction involving the BNE bonds. In early 1997, Rosenbaum wished to take a tax loss on his 1996 tax return based on the BNE bonds if they were without value. *Pet. to Vacate Arbitration Award in Part and Confirm in Part* ¶ 9 (hereinafter "*Pl.'s Pet.*"); *Answer to Pl.'s Pet. to Vacate Arbitration Award in Part and Confirm in Part* ¶ 9 (hereinafter "*Defs.' Answer*"). Thus, Rosenbaum asked Imperial to confirm that the bonds were worthless. On January 8, 1997, the Imperial Compliance Department notified Rosenbaum that there was no market or quotation for the BNE bonds. This representation was later reaffirmed on December 10, 1997, when a Senior Administrative Officer for Imperial wrote to Rosenbaum to confirm that the securities were worthless. Nevertheless, Rosenbaum's December 15, 1997, account statement indicated that Imperial had sold Rosenbaum's BNE bonds and that he had received $2.50 for the bonds.[3]

Thereafter, on September 18, 1998, there was an announcement that had a favorable impact on the market value of the BNE bonds. The bankruptcy trustee for the Bank of New

---

[3] Rosenbaum alleges that he never instructed Imperial to sell the BNE bonds. He argues that "they were not sold; they were removed from his account and placed in a 'worthless' account at Imperial." *Pl.'s Pet.* ¶ 11. Defendants deny this allegation, *Defs.' Answer* ¶ 11, and contend that Rosenbaum specifically authorized Rich to sell the BNE bonds.

England announced that a tentative settlement had been reached with the Federal Deposit Insurance Corporation for all outstanding claims. *Pl.'s Pet.* ¶ 12. Imperial later sold the BNE bonds formerly owned by Rosenbaum, for its own benefit, and received approximately $80,000.

In the course of investigating the circumstances of the BNE transactions, Rosenbaum apparently learned for the first time that Rich's Maryland registration had lapsed. Accordingly, under Maryland law, he was entitled to rescind his purchase of the GMD bonds he had purchased on Rich's recommendation in September 1997. In or about May 1998, Imperial purchased the GMD bonds from Rosenbaum for their then market value, approximately $68, 000.

### B.

In April 1999, Rosenbaum, apparently acting without the assistance of counsel, filed an arbitration claim with the National Association of Securities Dealers (NASD). In this claim, Rosenbaum contends that

> [w]ithout [his] instruction, knowledge or consent, . . . the [BNE] securities were transferred (through a series of convoluted trades extending over a period from December 15, 1997 through and including December 19, 1997) to an "Imperial Capital Worthless Account" according to records recently made available to me. The relief which is sought is to have these securities returned to my account.

*Statement of Claim* at 1. Rosenbaum also requested that the GMD transaction be "revoked or annulled, that the monies paid be returned to my account, and that I be allowed to place these bonds back in the Imperial pool of securities." *Id.* at 1-2. For "a similar" reason, he

requested that the transfer of the BNE bonds be revoked or annulled in the same manner as

the GMD bonds.[4] *Id.* at 2.   Rosenbaum further asserted that

> [o]n the approximate dates of the transfer from [his] account to the Imperial
> Worthless Account, [the BNE] bonds had a significant value. Lack of due
> diligence is one thing, but deceptive conveyance with an obvious conflict of
> interest creates the strong probability of fraud, which would place this within
> the realm of treble damages.  The relief sought for this latter matter is that
> three times the amount of [BNE] securities, which were removed from my
> account, be returned to it.

*Id.*

Prior to the arbitration hearing, Rosenbaum, Imperial and Rich executed Uniform

Submission Agreements whereby they agreed to submit the controversy to arbitration. The

submission agreement also provides that a court of competent jurisdiction could enter

judgment upon the award of the arbitrators.

On April 12, 2001, defendants filed with the NASD a motion to dismiss the GMD

claim, on the ground that it was barred by the applicable statute of limitations. In their

motion to dismiss, defendants conceded that Rich was not a registered broker at the time of

---

[4]  More specifically, the statement of claim states:

> In preparing myself for this arbitration, two facts became known to me
> which I also wish to include as added claims.  The State of Maryland shows that
> Eloise Rich, the agent and broker for Imperial Capital, was not registered in the
> State of Maryland during the time of a solicited trade, in which she sold me, as a
> principal transaction, [GMD] bonds.  Remedially, I requested this transaction be
> revoked or annulled, that the monies paid be returned to my account, and that I be
> allowed to place these bonds back in the Imperial pool of securities.
>
> For a similar reason, that of an *unauthorized* trade by a non-registered
> *broker/dealer*, I request that the transfer of the [BNE] securities also be annulled
> or revoked, as stated above.

*Statement of Claim* at 1-2 (second emphasis added).

the GMD transaction and that registration is required by the Annotated Code of Maryland, Corporations and Associations, § 11-401(a).[5] Defendants also conceded that, under Maryland law,[6] Rich, as a seller, was potentially civilly liable to her buyer, Rosenbaum. Defendants contended that pursuant to the Annotated Code of Maryland, Corporations and Associations, § 11-703(f)(2), "an action may not be maintained . . . [t]o enforce any liability created under subsection (a)(1)(i) of this section, unless brought within one year after the violation on which it is based." *See infra* note 7. Defendants argued that the one-year limitation may not be extended by application of a "discovery rule." Specifically, defendants argued that because a "discovery rule" was expressly created by the Maryland Legislature for the accrual of a claim as to violations of § 11-703(a)(1)(ii) and § 11-703(a)(2), the absence of any express "discovery rule" for a violation of § 11-703(a)(1)(i) was purposeful, and the implication of a "discovery rule" for a violation of "subsection (a)(1)(i)" was inappropriate. *See* §§ 11-703(f)(2) and (f)(3).[7] Accordingly, defendants contended, as the

---

[5] The Annotated Code of Maryland, Corporations and Associations, § 11-401(a) provides that a "person may not transact business in this State as a broker-dealer or agent unless the person is registered under this subtitle."

[6] The Annotated Code of Maryland, Corporations and Associations, § 11-703(a)(1)(i), states, in pertinent part, that "[a] person is civilly liable to the person buying a security from him if he: (i) offers or sells the security in violation of . . . § 11-401(a) . . . of this title . . . .

[7] The Annotated Code of Maryland, Corporations and Associations, § 11-703(f)(2), states in full:

(f) *Limitation of actions; effect or offer of refund.* — (1) A person may not sue under subsections (a)(1) and (2) of this section after the earlier to occur of 3 years after the contract of sale or purchase or the time specified in paragraph (2) of this subsection.

(2) An Action may not be maintained:

(continued...)

GMD bonds had been purchased on September 3, 1997, the one-year limitation on

Rosenbaum's claim required Rosenbaum to initiate his action before September 3, 1998.

As the claim was not filed until April 1999, it was time-barred. On May 4, 2001, a hearing

was held before a NASD panel of three arbitrators. The NASD panel denied the motion

without prejudice. *See Arbitration Award* at 2.

Rosenbaum asserted the following causes of action: violation of the Maryland Blue

Sky Laws, fraud, breach of fiduciary duty, breach of good faith and fair dealing,

unauthorized trading and negligence. *Arbitration Award* at 1. Defendants denied all of the

material allegations. *Id.* Defendants asserted the following defenses:

> Imperial is not a proper respondent in this arbitration as all transactions at
> issue occurred while Claimant maintained his account at [DRI] not the
> predecessor Imperial; Claimant has failed to state a claim upon which relief
> may be granted; Claimant approved and ratified all the acts and transactions
> complained of; Claimant's alleged losses were proximately caused by his own
> conduct and negligence; Imperial made a good-faith effort, as a controlling
> entity, to prevent any alleged fraudulent act on the part of any employee; all
> risks were fully explained to Claimant and he knowingly, willfully and
> voluntarily assumed the risks; Claimant's claims are barred by all applicable
> statutes of limitations; any losses incurred by Claimant were the result of

---

[7](...continued)

> > (i) To enforce any liability created under subsection (a)(1)(i) of this
> section, unless brought within one year after the violation on which it is based; or
> > (ii) To enforce any liability created under subsection (a)(1)(ii) or (2) of
> this section, unless brought within one year after the discovery of the untrue
> statement or omission, or after the discovery should have been made by the
> exercise of reasonable diligence.
> The Annotated Code of Maryland, Corporations and Associations, § 11-703(f)(3) states:
> A person may not sue under subsection (a)(3) of this section more than 3 years
> after the date of the advisory contract or the rendering of investment advice, or the
> expiration of 2 years after the discovery of the facts constituting the violation,
> which ever comes first.

market fluctuations beyond the control and responsibility of Respondents and that Claimant failed to use the requisite due diligence in monitoring and managing and handling investments.

*Id.* at 2.

More specifically, at the hearing, with regard to Rosenbaum's claim concerning the GMD bonds, defendants admitted that when Rich solicited the purchase of the GMD bonds, she was not registered in Maryland.[8] *Defs.'s Counter-Pet. to Vacate Award in Part and Confirm in Part* ¶ 9 (hereinafter *Defs.'s Counter Pet.*); *Answer to Defs.' Counter-Pet. to Vacate Arbitration Award in Part and Confirm in Part* ¶ 9 (hereinafter *Pl.'s Answer to Defs.' Counter-Pet.*). Defendants made two arguments in their defense to Rosenbaum's GMD bond claim. First, they renewed their limitations argument. Second, they claimed that Imperial was not a successor-in-interest to DRI, in accordance with the terms of their 1999 purchase-of-assets agreement, and thus Imperial was not liable for the debts of DRI. As for the BNE bond transaction, defendants denied that the December 1997 sale of the BNE bonds was unauthorized; Rich testified that Rosenbaum gave her the order in December 1997 to sell the BNE bonds.[9]

---

[8] Defendants argue that Rich's lack of registration was Rosenbaum's "sole basis" for his claim regarding the GMD bonds. *Defs.'s Counter-Pet.* ¶ 9. Rosenbaum denies this allegation. *Pl.'s Answer to Defs.' Counter-Pet.* ¶ 9; *see also supra* note 2 and accompanying text (discussing Rosenbaum's assertion that Imperial also admitted to being unregistered).

[9] Defendants claim that, during the hearing, Rosenbaum admitted to receiving monthly statements from Imperial that showed the sale of the BNE bonds in December 1997 and the subsequent absence of the BNE bonds from his portfolio. *Defs.' Counter-Pet.* ¶ 10. Defendants further claim that Rosenbaum admitted that he did not claim that the sale was unauthorized until almost a year later, after he learned that the BNE bonds had substantially increased in market
(continued...)

Rosenbaum demanded compensatory damages of $95,002.50 as to the GMD claim, "treble damages" of $9 million (based on the $3 million face value of the BNE bonds), and the revocation or rescission of the transactions. *Id.* Defendants demanded the dismissal of Rosenbaum's claims and the expungement of the claims from Rich's record. *Id.*

On June 5, 2001, the arbitration panel issued its award by unanimous agreement. *Arbitration Award* dated June 5, 2001. As is the custom in such proceedings, the panel did not issue findings and conclusions, or any opinion disclosing its reasoning. In granting very limited relief to Rosenbaum, it determined that Rosenbaum was entitled "to transfer his complete interest in the 144 GMD Bondholder Trust to Respondent Imperial Capital, LLC and in return Imperial Capital will pay to [Rosenbaum] the sum of $27,000 [without] prejudgment interest . . . ." *Id.* at 3. (This $27,000 represented the difference between the $95,000 purchase price paid by Rosenbaum in September 1997 and the $68,000 paid by Imperial to repurchase the bonds from Rosenbaum in 1998. Rosenbaum suggested this alternative relief during the arbitration hearing.) In the alternative, Rosenbaum could retain his interest in the GMD bonds and forego any compensation. The panel denied Rosenbaum's claim for treble damages. *Id.* The panel also recommended the expungement of all references to the arbitration from Rich's NASD records. *Id.* Finally, the panel stated that "[a]ny and all other requests for relief not specifically addressed herein are denied in their entirety." *Id.*

---

[9](...continued)
value after the sale. *Id.* Rosenbaum denies both of these assertions. *Pl.'s Answer to Defs.' Counter Pet.* ¶ 10.

On July 3, 2001, Rosenbaum filed his petition to vacate the arbitration award in part and to confirm in part and a motion to vacate arbitration in part, arguing that the panel's granting rescission of the GMD transaction should be confirmed, *Pl.'s Pet.* ¶ 26, and "[t]o the extent the award refuses to rescind the [BNE] 'sale' for $2.50, it should be vacated, with instructions to allow rescission of the BNE 'sale' or to provide Rosenbaum with the value that Imperial received on its sale of the BNE bonds." *Id.* In response, on August 10, 2001, defendants filed an answer to plaintiff's petition, a counter-petition to vacate the arbitration award in part and confirm it in part, and a motion to vacate the arbitration award in part and confirm it in part. Defendants contend that the award based on the GMD transaction should be vacated as the claim was time-barred and that the arbitral panel's refusal to sustain the claim based on the BNE transaction should be confirmed. *Defs.' Counter Pet.* ¶ 13; *Defs.' Mem. in Support of Defs.' Mot. to Vacate Arbitration Award in Part and Confirm in Part in Opposition to Rosenbaum's Mot. to Vacate Arbitration Award in Part* at 3 (hereinafter *Defs.' Mem. in Support*).

## II.

The FAA sets out four limited statutory grounds on which a district court can vacate an arbitration award. 9 U.S.C. § 10(a)(1)-(4);[10] *see also Remmey v. PaineWebber, Inc.*, 32

---

[10] The United States Code, FAA, Title 9, § 10 states, in pertinent part:
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
    (1) Where the award was procured by corruption, fraud, or undue means.
    (2) Where there was evident partiality or corruption in the arbitrators, or
                                                        (continued...)

F.3d 143, 146 (4th Cir. 1994)(explaining that Congress has limited the statutory grounds upon which arbitration can be vacated to 9 U.S.C. § 10(a)(1)-(4)), *cert. denied*, 513 U.S. 1112 (1995). In addition, a court may overturn a legal interpretation of an arbitration panel if "it is in manifest disregard for the law." *See, e.g., Upshur Coals Corp. v. United Mine Workers of America*, 933 F.2d 225, 229 (4th Cir. 1991) (citing *American Postal Workers v. United States Postal Serv.*, 682 F.2d 1280, 1284 (9th Cir. 1982), *cert. denied*, 459 U.S. 1200 (1983)); *Remmey*, 32 F.3d at 149; *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir.) ("Federal courts may vacate an arbitration award only upon a showing of one of the grounds listed in the [FAA], or if the arbitrator acted in manifest disregard of law." (citing *In re A.H. Robins Co., Inc.*, 197 B.R. 513, 516 (E.D. Va. 1994)), *cert. denied*, 525 U.S. 876 (1998)).

The Fourth Circuit has emphasized "the limited scope of judicial review that courts are permitted to exercise over arbitral decisions." *Remmey*, 32 F.3d at 146; *see Upshur Coals Corp.*, 933 F.3d at 228 ("An arbitrator's award is entitled to a special degree of

---

[10](...continued)
either of them.
    (3) Where the arbitrators were guilty or misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
    (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was no made.
    (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrator.
9 U.S.C. §10.

deference on judicial review."); *Apex Plumbing Supply, Inc.,* 142 F.3d at 193 ("Review of an arbitrator's award is severely circumscribed."). "Limited judicial review is necessary to encourage the use of arbitration as an alternative to formal litigation. This policy is widely recognized, and the Supreme Court has often found occasion to approve it." *Remmey,* 32 F.3d at 146 (citations omitted); *see Unites States v. Aegis/Zublin Joint Venture,* 869 F. Supp. 387, 391 (E.D. Va. 1994) ("[T]he Court's jurisdiction under the [FAA] is strictly limited to avoid frustrating the purpose of arbitration—avoiding litigation." (citing *Jardine Matheson & Co., Inc. v. Saita Shipping, Ltd.,* 712 F. Supp. 423, 426 (S.D.N.Y. 1989))).

The Fourth Circuit has further explained the policy favoring arbitration:

> A policy favoring arbitration would mean little, of course, if arbitration were merely the prologue to prolonged litigation. If such were the case, one would hardly achieve the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." . . . Open up arbitral awards to myriad legal challenges would eventually reduce arbitral proceedings to the status of preliminary hearings. Parties would cease to utilize a process that no longer had finality. To avoid this result, courts have resisted temptations to redo arbitral decisions. As the Seventh Circuit put it, "arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party." . . .

*Remmey,* 32 F.3d at 146 (citations omitted).

In reviewing arbitral awards, therefore, district and appellate courts are confined to ascertaining "whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Id.* (internal quotation marks omitted) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Transportation Communications Int's Union,* 973 F.2d 276, 281 (4th Cir. 1992)). "Courts are not free to

overturn an arbitral result because they would have reached a different conclusion if presented with the same facts." *Id.* As the Fourth Circuit has determined, an arbitration award is enforceable "'even if the award resulted from a misinterpretation of law, faulty legal reasoning or erroneous legal conclusion,' . . . and may only be reversed 'when arbitrators understand and correctly state the law, but proceed to disregard the same.'" *Upshur Coals Corp.*, 933 F.2d at 229 (citations omitted); *see Aegis/Zublin Joint Venture*, 869 F. Supp. at 391.

Significantly, for present purposes, the Fourth Circuit has explained the use of arbitration in resolving securities laws claims. The court has stated:

> [W]e note that arbitration has often been used to resolve securities laws claims brought by disappointed investors against brokerage houses. If all claims arising out of unprofitable investments were subjected to the full rigors of litigation, the result could well be increased brokerage transactions costs that would ultimately redound to the detriment of the investing public. Nothing in the [FAA] or the various securities laws suggests that arbitral proceedings are inappropriate in this setting.

*Remmey*, 32 F.3d at 146-47.

The parties attack separate portions of the arbitral award on the ground that the award was in "manifest disregard of the law." *See Defs.' Mem. in Support* at 4; *Pl.s' Mem. in Support of Mot. to Vacate Arbitration Award in Part* at 4 (hereinafter *Pl.s' Mem. in Support*). A party making a claim based on manifest disregard shoulders a heavy burden. "[A]n arbitration panel's interpretation of the law will not be reversed [for manifest disregard of the law] unless the 'arbitrators understand and correctly state the law, but proceed to disregard the same.'" *Remmey*, 32 F.3d at 149 (quoting *Upshur Coals Corp.*, 933

F.2d at 229). A court's belief that the law has been misapplied "does not justify vacation of an arbitral award." *Id.* The parties are required to demonstrate that the arbitrators "were aware of the law, understood it correctly, found it applicable to the case before them, and yet chose to ignore it in propounding their decision." *Id.* (citing *National Wrecking Co. v. International Brotherhood of Teamsters, Local 731*, 990 F.2d 957, 961 (7th Cir. 1993); *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111-12 (2d Cir. 1993)); *see Marshall v. Green Giant Co.*, 942 F.2d 539, 550 (8th Cir. 1991) ("[T]here must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it." (internal quotation marks omitted) (alteration in original) (quoting *O.R. Secs. v. Professional Planning Assoc.*, 857 F.2d 742, 7417 (11th Cir. 1988))). The arbitrator's interpretation must not be just erroneous but must amount to an "overt disregard" of the law. *Folkways Music Publishers, Inc.*, 989 F.2d at 111 (citing *Wilko v. Swan*, 346 U.S. 427, 436-37 (1953)). Lastly, "the law ignored by the arbitrators must be 'well defined, explicit, and clearly applicable' if the award is to be vacated." *Id.* at 112 (quoting *Carte Blanche (Singapore) PTE, Ltd. v.Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 265 (1989)).

### III.

Proper application of the above principles compels the rejection of the parties' respective attempts to upset the arbitral award under review here. I explain.

### A.

Rosenbaum argues that the BNE transaction should be rescinded substantially for the same reason that the GMD transaction was rescinded-- Rich was not registered (as an

investment advisor) as required by Maryland law-- and thus, the arbitrators' failure to rescind the BNE transaction was in manifest disregard of the law. Defendants answer that this contention is unavailing because prior to Rosenbaum's filing of the instant petition to vacate , he never claimed that Imperial acted as his investment advisor or that Rich was an investment advisor representative in connection with the BNE sale. (In the GMD transaction, Rich was acting as an unregistered *broker-dealer*, as defendants conceded, which led directly to the rescission of the GMD transaction.) Rosenbaum also argues, as to the BNE transaction, that Imperial acted as an investment advisor and Rich as an investment advisor representative, not as a broker-dealer as argued in the statement of claim, *supra* note 4 and accompanying text. Defendants have the better of the argument: first, the BNE claim as now argued was not raised during arbitration and thus cannot be raised now; second, even if the BNE claim was addressed in this manner before the arbitration panel, the arbitration panel did not act in manifest disregard of the law in formulating its award.

1.

Rosenbaum insists that the arbitration panel disregarded the registration laws by "ignoring" clear proof that Imperial and Rich violated Maryland laws, i.e., §11-401(b), §11-402 (b), § 11-703 (a)(1)(i), and § 11-703(a)(3)(ii). According to Rosenbaum, Imperial acted as an investment advisor and Rich as an investment advisor representative, even though each was unregistered, recommending transactions to him and receiving "indirect consideration from Rosenbaum for 'selling' the BNE bonds because they 'sold' the bonds to themselves for $2.50 and they pocketed some $80,000 in proceeds when the bonds

recovered some value." *Pl.'s Memo. in Support* at 5.

It appears that Rosenbaum's principal factual support for the contention that he presented this issue during the arbitration proceedings is the fact that the panel heard testimony from Ellen E. Cherry. Cherry, a Senior Broker-Dealer/Agent-Examiner, who has over twenty years' experience at the State of Maryland Office of the Attorney General, Securities Division, testified in part "that *any* transaction-- whether purchase *or* sale *or* transfer-- of securities by an unregistered person is subject to recission."[11] *Id.* Rosenbaum

---

[11] The transcript of the portion of the arbitration testimony on which Rosenbaum relies is quite unilluminating. The following colloquy occurred during arbitration:

> [Plaintiff's Attorney]: With regard to the statute of limitations as contained therein, there is a one-year statute and three-year statute of limitations is that correct.
> [Cherry]: That's correct.
> [Plaintiff's Attorney]: With regard to the one-year statute of limitations, can you tell this panel when that one-year statute begins?
>
>      *                    *                    *
>
> [Cherry]: There are two statutes of limitations. One is the three-year and one is the one-year. One-year that I'm familiar with is not a registration statute. It's a one-year statute from the date of your knowledge of . . . violation.
> [Plaintiff's Attorney]: With regard to . . . the application of [The Maryland Securities Act] . . . can you tell this panel whether it applies only to purchases or whether it applies to both purchases and . . . sales or . . . transfers of . . . securities an bonds.
> [Cherry]: The Maryland Securities Act states that it's unlawful to transact securities in this state without being registered.
> [Plaintiff's Attorney]: Transact would include both.
> [Cherry]: It include[s] offers or sales.
>
>      *                    *                    *
>
> [Defendants' Attorney]: Yes, thank you. Ms. Cherry, you said that . . . you're not familiar with the one-year statute that applies to registration requirement?
> [Cherry]: The three year _____.
> [Defendants' Attorney]: Well are you familiar with any statue of limitations that applies to the question of a trade being made by a broker who was not registered in the state.
> [Cherry]: No, I'm not qualified to testify to that.

(continued...)

notes that §11-401(a) states that "[a] person may not transact business in this state as a broker-dealer or agent unless the person is registered under this subtitle." *Id.*; *supra* note 5 and accompanying text. Additionally, he notes that § 11-401(b)(1) sets out the identical rule for investment advisors.[12] He then argues that both Imperial and Rich do not dispute that they violated §11-401(b)(1).[13] Rosenbaum also argues that Imperial and Rich violated § 11-402 (b)(1), *id.*, which states that "[a]n investment adviser required to be registered may not employ or associate with an investment adviser representative unless the representative is registered under this subtitle."

Rosenbaum argues that § 11-703 (a)(1)(i), *supra* note 6, provides for civil liability

---

[11](...continued)

[Defendants' Attorney]: . . . Ms. Cherry . . . you said that it's your opinion that the registration requirement applies to both purchases and sales.

[Cherry]: In the State of Maryland transacting securities.

[Defendants' Attorney]: [C]an you strike that, are you familiar however with the civil liabilities portion of the statute that relates to transactions that are done when you're not registered.

[Cherry]: No I'm not qualified to testify to that.

[Defendants' Attorney]: So you're not qualified to testify as to whether . . . a person can recover money damages in a civil proceeding like this with respect to a trade where the broker was not registered. Is that correct.

[Cherry]: I can testify to that it is a violation of the Maryland Securities Act to transact in a securities, be it a offer or sale, in the State of Maryland without being registered.

*Tr. of Arbitration Hr'g, Tape 1, May 4, 2001* at 25-25.

[12] Section 11-401(b) states that "[a] person may not transact business in this State as an investment adviser or as an investment adviser representative" unless she satisfies one of three exceptions. MD. CODE ANN., CORPS. & ASS'NS § 11-401(b).

[13] Defendants have only conceded that Rich violated §11-401(a); Defendants have not acknowledged that Imperial violated either §11-401(a) or §11-401(b) or that Rich violated §11-401(b).

for a person acting in violation of §11-401(b) and of § 11-402 (b). Manifestly, this is incorrect. Rather § 11-703(a)(1)(i) states that a person "is civilly liable to the person buying a security from him if he . . . [o]ffers or sells the security in violation of § 11-401(a) . . . [or] § 11-402(a). As explained *supra*, § 11-401(a) and § 11-402(a) address broker-dealers and § 11-401(b) and § 11-402(b) address investment advisors and investment advisor representatives. Section 11-703(a)(3)(ii) provides that a person "is civilly liable" if that person receives any consideration, directly or indirectly, from another for acting as an investment advisor or representative and engages in any business practice that would operate as a fraud or deceit on another person.[14] In an effort to tease an argument out of these various provisions of the code, Rosenbaum argues

> Imperial . . . and Rich violated each of these civil liability provisions. In violation of § 11-7039(a)(1)(i), Rich sold Dr. Rosenbaum the GMD bonds when she was unregistered. In violation of § 11-703(a)(3)(i), Rich advised Dr. Rosenbaum concerning various investment opportunities and the value of the BNE bonds and secured a letter indicating the BNE bonds were worthless when she was unregistered. In violation of § 11-703(a)(1)(i) and (a)(3)(i), Rich was associated with or was Imperial's . . . agent during the relevant period. Moreover, in violation of § 11-703(a)(3)(ii), Imperial . . . and its agent Rich received significant consideration for the subsequent sale of the BNE bonds as a result of deceiving Rosenbaum (by "selling" his BNE bonds to a

---

[14] The Annotated Code of Maryland, Corporations and Associations, § 11-703(a)(3)(ii) states that

a person is civilly liable to another person if the person . . . [r]eceives, directly or indirectly, any consideration from another person for advice as to the value of securities of their purchase or sale or for acting as an investment adviser or representative under § 11-101 (h) and (I) of this title, whether through the issuance of analyses, reports, or otherwise, and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person.

worthless account without authorization and later pocketing $80,000 for allegedly worthless securities).

*Pl.'s Opp. to Defs.' Mot. to vacate* at 5. These arguments come too late.

Defendants correctly point out that the investment advisor issue and its corresponding code provisions, §11-401(b), § 11-402(b), § 11-703(a)(1)(i), and § 11-703(a)(1)(ii), regarding Imperial and Rich were not raised before the arbitration panel and thus cannot be raised for the first time here. "[A] party to arbitration cannot 'voluntarily engage in the arbitration of the issues submitted to the arbitrator and then attack the award on grounds not raised before the arbitrator.'" *United Food and Commercial Workers, Local 400 v. Marval Poultry Co., Inc.*, 876 F.2d 346, 352 (4th Cir. 1989) (quoting *International Chemical Workers Union v. Mobay Chemical Corp.*, 755 F.2d 1107, 1112 (4th Cir. 1985)). The Seventh Circuit has similarly stated:

> Failure to present an issue before an arbitrator waives the issue in an enforcement proceeding. . . . Parties, such as National, cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court. We will not tolerate such sandbagging. . . . "Permitting parties to keep silent during arbitration and raise arguments in enforcement proceedings would undermine the purpose of arbitration . . . ."

*National Wrecking Co.*, 990 F.2d at 960-61 (citations omitted).

Rosenbaum, no doubt recognizing that his present arguments were not before the arbitration panel, contends that it should have been "logical" for the arbitrators to conclude that the BNE transaction should be rescinded on the same grounds as the GMD transaction, as the panel recognized that Rich was not registered as a broker-dealer, at the time of the

transactions. *Pl.'s Opp. to Defs.' Mot. to Vacate* at 5-6. A contention that the panel should

have made this "logical" jump is simply not sufficient to demonstrate that the issue has been

raised. Rather, Rosenbaum should have taken the "logical" step of expressly stating his

arguments during arbitration, either in the statement of claim, during his opening or closing

statements, or through testimony at trial. The record of the arbitration is simply devoid of

any indication that he did so.

Moreover, it is clear that the "non-registration" issue presented here is materially

different from the "non-registration" issue presented to the arbitrators.[15] Rosenbaum is

arguing, in part, that the BNE transaction should be rescinded because Rich was not a

registered investment advisor representative and Imperial was not a registered investment

advisor. The GMD transaction was rescinded because it was determined by the arbitration

panel that Rich was not registered as a *broker-dealer* at the time of the transaction. Different

provisions of Maryland law address broker-dealers and investment advisors.[16] It is clear that

_____

[15] Moreover, §11-703(a)(1)(i) states that an unregistered person who *sells* to a person is
civilly liable. *See supra* note 6. Nowhere in the transcript of the arbitration hearing was this
provision of the code raised in relation to the BNE transaction. It appears that Rosenbaum relies
on the Cherry testimony in support as Rosenbaum argues her testimony was relating to the BNE
transaction when she stated that "Maryland securities law prohibited an unregistered person from
transacting in securities, which includes both *sales and purchases*." *Pl.'s Opposition to Defs.'
Mot. to Vacate* at 6 (emphasis added). It appears from Cherry's testimony that Rosenbaum's
attorney was attempting to clarify the civil liability with regards to the registration requirement
by emphasizing that "transaction" refers to purchases and sales. However, this ambiguous
testimony does not demonstrate that the issue had been raised. Even if it were sufficient, the
arbitration panel did not act in manifest disregard of the law for the same reasoning discussed
*supra*. In addition, § 11-703(a)(3) does not apply to the BNE transaction; Imperial and Rich did
not sell the BNE securities to Rosenbaum, but Rosenbaum arguably sold them to Imperial.

[16] A broker-dealer is defined as "a person engaged in the business of effecting

(continued...)

the statement of claim addresses the proper registration of *broker-dealers* and that the

transcript of the arbitration hearing does not demonstrate any discussion regarding the

registration of *investment advisors*. As such, it appears that the arbitration panel did not

analyze, discuss, or have presented before it, the investment provisions of the code, §11-

401(b) and §11-402(b) and § 11-703(a)(3). The statement of claim does assert a failure to

register claims as to both the GMD and BNE transactions, but only as failure to register as

a broker-dealer, not an investment advisor. The statement of claim alleges:

> For a similar reason, that of an unauthorized trade by a non-registered
> *broker/dealer*, I request that the transfer of the [BNE] securities also be
> annulled or revoked, as stated above.

---

[16](...continued)

transactions in securities for the account of others or for his own account." MD. CODE ANN.,
CORPS. & ASS'NS § 11-101(c). An investment adviser means a person who, for compensation:

(i) Engages in the business of advising others, either directly or through
publications or writings, as to the value of securities or as to the advisability of
investing in, purchasing, or selling securities, or who, for compensation and as a
part of a regular business, issues or promulgates analyses or reports concerning
securities; or

(ii) 1. Provides or offers to provide, directly or indirectly, financial and
investment counseling or advice, on a group or individual basis;

2. Gathers information relating to investments, establishes financial goals and
objectives, processes and analyzes the information gathered, and recommends a
financial plan; or

3. Holds out as an investment adviser in any way, including indicating by
advertisement, card, or letterhead, or in any other manner indicates that the person
is, a financial or investment "planner", "counselor", "consultant", or any other
similar type of adviser or consultant.

MD. CODE ANN., CORPS. & ASS'NS § 11-101(h).

An investment adviser representative
means any partner, officer, director of (or a person occupying a similar status or
performing similar functions) or other individual who is employed by or
associated with an investment adviser, or who has a place of business located in
this State and is employed by or associated with a federal covered adviser . . . .

MD. CODE ANN., CORPS. & ASS'NS § 11-101 (i)(1).

-21-

*Statement of Claim* at 1 (emphasis added).

Upon examination of the transcript of the arbitration hearing, it is evident that recission of the BNE transaction based on lack of registration as an investment advisor was not raised before the arbitration panel as the Maryland registration provisions were at no time discussed in conjunction with the BNE transaction. *See Tr. of Arbitration Hr'g, Tape 1, May 4, 2001* at 20; *Tr. of Arbitration Hr'g, Tape 2, May 4, 2001* at 13-14; *Tr. of Arbitration Hr'g, Tape 2, May 4, 2001* at 30-32; *Tr. of Arbitration Hr'g, Tape 3, May 4, 2001* at 24-26. In addition, nowhere in the transcript of the arbitration hearing is there any discussion relating to the BNE transaction with regard to an investment advisor strict liability claim, § 11-703 (a)(i), *supra*, or an investment advisor fraud claim, § 11-703(a)(3)(iii), *supra*. Lastly, there was no discussion during the arbitration regarding whether Imperial lacked any type of registration. In sum, the issues relied on in this branch of the case by Rosenbaum are foreclosed from consideration by his failure to raise them in the course of the arbitration proceedings.

2.

Even if the issue of the registration of investment advisors and investment advisor representatives had been properly raised before the arbitration panel, Rosenbaum has not demonstrated that the arbitral award suffers from a manifest disregard of the law in this respect. Further, Rosenbaum has failed to meet the burden of demonstrating "that the arbitrator *deliberately* disregarded what the arbitrator knew to be the law in order to reach

a particular result," *National Wrecking Co.*, 990 F.2d 961 (emphasis added). Rosenbaum has not shown that the arbitrators understood and correctly stated the law and then were not simply wrong in their application of the law, but rather acted in overt disregard of the law. *Cf. Marshall*, 942 F.2d at 550 (determining, that with regards to the question of manifest disregard of the law, "Green Giant has failed to demonstrate that the arbitrator both recognized and ignored the law"); *National Wrecking Co.*, 990 F.2d at 961-62 ("The arbitrator's award may be erroneous, but, even if it is, it does not evidence a manifest disregard for the [Department of Transportation] regulations. [Petitioner] has failed to show that the arbitrator deliberately disregarded what he knew to be the law."). As stated *supra*, there simply was no discussion of this law with regards to the BNE transaction from either the parties or from the arbitration panel.

For all of these reasons, Rosenbaum's motion to vacate the award in part shall be denied.

### B.

For their part, defendants argue that the arbitration panel acted in manifest disregard of the law in granting relief on Rosenbaum's strict liability claim based on the fact that Rich was not registered as a broker-dealer agent in Maryland at the time that she solicited Rosenbaum's purchase of the GMD bonds because the claim was time-barred and should have been dismissed. According to defendants, "[t]he panel disregarded the law that both sides agreed governed the claim and, therefore, paragraph 1 of the award should be vacated." *Defs.' Mot. to Vacate* at 6.

As discussed *supra*, § 11-703(f)(2)(i) states that a claim under §11-703(a)(1)(i) must be brought "within one year after the violation" of § 11-401(a)(i) or § 11-402(a)(i). Defendants argue here, as they argued before the arbitrators, that Rosenbaum's claim accrued at the time of the alleged violation and that the above provision did not allow for tolling until the violation was discovered. *See, e.g., Defs.' Mot. to Vacate* at 6 (citing *Shuman v. Sherman*, 356 F. Supp. 911, 913 (D. Md. 1973)). Rosenbaum purchased the GMD bonds in September 1997 and filed his claim in April 1999. It is clear that defendants asserted the time-bar before the arbitration panel in their answer, motion to dismiss, and opening and closing statements during the arbitration hearing. Thus, defendants argue that "[w]ith full knowledge of the law, the arbitration panel simply refused to apply it. Thus, the panel's award of relief was in manifest disregard of the law." *Defs.' Mot. to Vacate* at 7.

In response to defendants' motion to dismiss, discussed at the arbitration hearing, Rosenbaum stated:

> My position is that in dealing with the broker it's a fair assumption that person is licensed to do what they're supposed to do. And it would have been improper, or let's say out of the ordinary for me to over that point in time stop and say wait a minute before I deal with I want to find out if you're licensed. It wasn't until we had problems that I went in and found out that was unlicensed and the claim was filed within one year of that date. Otherwise the question is what is propriety. Do you check and see if an attorney has passed the bar, do you see if a guy's passed the CPA exam, or is it a fair assumption that person is able to do what they're supposed to do and within one year of my discovery, I did, and I took appropriate action.

*Tr. of Arbitration Hr'g, Tape 1, May 4, 2001* at 9. Rosenbaum also offered the conflicting testimony of Cherry, *supra* note 11. Cherry testified regarding her knowledge of the statue

of limitations:

> There are two statutes of limitations. One is the three-year and one is the one-
> year. One year that I'm familiar with is not a registration statute. It's a one-
> year statute from the date of your knowledge of . . . violation.

*Tr. of Arbitration Hr'g, Tape 1, May 4, 2001* at 24. Yet, when asked if she was familiar

with "the civil liabilities portion of the statute that relates to transactions that are done when

you're not registered," Cherry answered that she was not qualified to answer that question.

*Id.* at 24-25. Rosenbaum then submitted those relevant portions of the Maryland Code into

evidence. *Id.* at 26.

In closing argument, Rosenbaum argued:

> The law is clear that when you deal with statutes of limitations, they don't
> become activated until the discovery of the violation. Dr. Rosenbaum acted
> forthwith upon learning of the violation. The Blue Sky law provides that the
> transaction should be set aside.

*Tr. of Arbitration Hr'g, Tape 3, May 4, 2001* at 24. Defendants, in their closing argument,

admitted that Rich was not properly registered but argued that the statute of limitations

should be construed strictly so as to bar Rosenbaum's claim:

> These statutes should be strictly construed. There is strict liability. We
> concede all of that. But because they should be strictly construed, you have
> to construe them strictly not only at the start, buy at the back end of it and all
> the way through. And it's now very clear that whereas these bonds were
> purchased in September '97, the statement of claim was not filed until April
> of '99. That is more than one year after the purchase. And if you look at the
> Maryland statute, it's very clear on what the statute of limitations is, in section
> 11-703, sub f, and again it says very clearly that, particularly in subsection 1
> and 2 of f, that if you're suing to enforce a liability trading under what the
> statute says-- within one year after the violation. Now, as counsel says, there
> is sometimes a discovery period in connection with these statutes. But that's
> on the fraud side. They're not suing for fraud on the GMD bonds. The doctor

has conceded Ms. Rich explained them to him, solicited the trade, he bought it. There's no suggestion of a fraud claim in connection with the GMD bonds; it's only the Blue Sky for failure to be registered. So the section of the statute of limitations that deals with the fraud sections says you get one year after the discovery-- up to three years from the purchase, but that's only on the fraud side. If it's failure to be registered in the state, but because it's such an easy kind of thing to recover on, the fairness on the other side is, you have whatever the statue says is your time to sue and no more. So he went past the one year time limitation, and on that basis the claim on the GMD bonds . . . should be denied.

Now, you're the arbitrators; you're going to make the call.

*Id*. at 25.

Defendants have not demonstrated a manifest disregard for the law on the part of the arbitration panel. First, it is important to note, again, that in reviewing an arbitral award, it is the role of the court to determine whether the arbitrators have done the job required of them and not whether they did it correctly or well or whether given the same facts, the reviewing court would have reached a different conclusion. *Supra* p.12. Furthermore, the standard of manifest disregard of the law requires something beyond simply applying the law incorrectly or reaching an erroneous legal conclusion. The arbitration panel here was provided the relevant law and arguments supporting both sides. The arbitrators made no remark that they knew what the correct application of the law was but were going to decide against the accepted interpretation of the law. Instead, it appears that the arbitrators did their job; they interpreted and applied the law. It is not this court's role to decide whether the arbitrators applied this law correctly. *Cf. Brown v. ITT Consumer Financial Corp.*, 211 F.3d 1217, 1223 (11th Cir. 2000) ("Even if the arbitrator applied the wrong standard, which we need not decide, no manifest disregard for the law has been shown, [petitioner's] argument

fails.").

IV.

For the reasons set forth herein, the arbitral award shall be confirmed. An Order follows.

Filed: October 29, 2001

ANDRE M. DAVIS
UNITED STATES DISTRICT JUDGE